1
2
3
4
5
6
7

FILED & ENTERED

AUG 02 2017

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY Gonzalez DEPUTY CLERK

8

## UNITED STATES BANKRUPTCY COURT

9

## CENTRAL DISTRICT OF CALIFORNIA

10

## SAN FERNANDO VALLEY DIVISION

11

12  In re:

13  Palmdale Hills Property, Inc. and related
    Debtors

14

15

16                              Debtor(s).

17

18  Steven M Speier

19                              Plaintiff(s),

20      v.

21

22   Argent Management, LLC,  SunCal
    Management LLC

23

24                              Defendant(s).

25

CHAPTER 11

Case No.:  8:08:bk-17206-ES
Adv No:   1:16-ap-01125-GM

**MEMORANDUM OF DECISION GRANTING
DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT IN PART AND CONTINUING
HEARING**

Date:  May 30, 2017
Time:  10:00 a.m.
Courtroom: 303

26

27

28

Defendants SunCal Management, LLC ("SCM") and Argent Management, Inc.

("Argent" and, with SCM, the "Defendants") bring a motion for summary judgment (the

"MSJ") on the first claim for relief (Breach of Contract) and the second claim for relief

-1-

(Unjust Enrichment and/or Restitution) by plaintiff Stephen M. Speier (the "Trustee"), as chapter 11 trustee and liquidating trustee for debtor SunCal Oak, LLC (the "Debtor"), or, in the alternative, for partial summary adjudication.

**Service:** appears to be in order.

**Procedural Background**

　　This motion is made in one of twelve related adversary proceedings now before this Court. The twelve debtors involved in these adversary proceedings are in turn part of a larger related group of twenty-six debtors (the "SunCal Debtors") that were formed to develop residential real estate projects in the Western United States (the "Projects"). The Debtor's project was located in Oakland and is known as Oak Knoll (the "Project" or the "Oak Knoll Project").

　　Defendant SCM was formed to provide development management services to the SunCal Debtors.  Defendant Argent allegedly also provided management services to the Debtors and is allegedly a successor-in-interest, alter ego, *etc.* of SCM.

　　Each of the SunCal Debtors' projects had received funding from Lehman Brothers Holding, Inc. and related entities (collectively "Lehman"), which had first-priority deeds of trust on and equity interests in each Project, and had also agreed to provide continuing funding. Lehman's failure to provide that funding appears to have precipitated the chapter 11 filings (seventeen voluntary and nine involuntary) of the SunCal Debtors in November 2008.

　　The Trustee had been appointed the chapter 11 trustee for each of the involuntary SunCal Debtors and - through two plans of reorganization governing various

SunCal Debtors, which were each confirmed in January 2012 (the "Plans") - was appointed the liquidating trustee of most of the SunCal Debtors, including the Debtor. The SunCal Debtors' Projects were also transferred to Lehman on an "as is" basis pursuant to the Plans and related confirmation orders (the "Confirmation Orders").

In May 2012, the Trustee filed the twelve subject complaints (which were twice subsequently amended) against the Defendants, each complaint seeking to recover substantial payments for management fees and expenses made by the relevant SunCal Debtor to SCM during the four-year period prior to the SunCal Debtors' bankruptcies. These complaints asserted claims for breach of contract, restitution/unjust enrichment, fraudulent transfer, and preferential transfer.

**Oak Knoll Project and Adversary Proceeding**

The Oak Knoll Project called for the development of a 168-acre former naval medical center purchased from the United States for $100.5 million[1] (the "Property") into a planned community with 960 residences (single family homes, townhomes, and apartments) and 72,000 square feet of retail, by selling fully-entitled and buildable lots to merchant builders. [UF Nos. 1, 2, 3, 14, 17][2]

In order to develop the Oak Knoll Project, the Debtor and SCM entered into a Development Management Agreement dated December 29, 2005 (Dec. of Bruce V. Cook, Ex. 6; the "DMA"). [UF No. 19] In general terms, the DMA provided that SCM would manage the development of the Project and the Debtor would fund that development, including the payment of management fees to SCM. [UF Nos. 27, 28]

---

[1] Dollar amounts are often rounded for convenience.
[2] UF refers to the Defendants' Uncontroverted Facts, as set forth in Defendants' Statement of Uncontroverted Facts and Conclusions of Law [dkt. 311-1].

Section 5.1 of the DMA provided that the Debtor would pay SCM (a) an "Operating Management Fee" of 3% of (i) gross sales revenue from the Project and (ii) net proceeds from the funding of any related community facilities districts and (b) a "Sales Management Fee" of 1% of gross sales revenue. [UF Nos. 130, 131]  (The Operating Management Fee and the Sales Management Fee are collectively referred to as the "Management Fee.") The first 2% of the gross revenue was to be paid to SCM in equal monthly installments (calculated based on expected gross sales revenues) during the development of the Project, with the remainder of the Management Fee to be paid upon the close of escrow of each sale. [UF Nos. 133-136]

Section 5.3 of the DMA also provided that the Debtor would reimburse SCM for third-party out-of-pocket expenses incurred by SCM and for the compensation SCM paid to employees and contractors who directly worked on the Project.  Certain expenses, such as insurance, salaries of senior level management not devoted exclusively to the Project, and overhead expenses relating to SCM's home office, remained the sole responsibility of SCM. [UF No. 132]

Starting in 2006: Lehman SunCal Real Estate Holdings, LLC ("Parent") was 100% owner of the Debtor. [UF No. 6] Lehman SunCal Real Estate Fund, LLC ("Grandparent") in turn owned 100% of the Parent. [UF No. 7] LBREP II/SunCal Land Fund Member LLC ("Lehman Fund") owned 90% of the Grandparent, while SunCal Communities II, LLC (the "SunCal Entity") owned the remaining 10% of the Grandparent. [UF Nos. 8, 9] On August 8, 2006, the Lehman Fund and the SunCal Entity entered into a "Grandparent Operating Agreement" governing the operation of the Grandparent. [Cook Dec. Exhibit 4]

SCM worked extensively to develop the Oak Knoll Project (*see* the list of work

performed at 13:26-14:28 of the Motion). [UF Nos. 93-117] Between the signing of the DMA on December 29, 2005 and the Debtor's November 19, 2008 petition date the Debtor paid SCM approximately $4 million in management fees (about $158,000/month) and $3 million for expenses. [UF Nos. 162, 163]

After Lehman filed for bankruptcy on September 15, 2008, Lehman refused to fund the Oak Knoll Project. The Debtor accordingly stopped making payments to SCM and SCM was accordingly unable to continue developing the Project. [UF No. 167, 170-173,182] SCM asserts that the Oak Knoll Project was 30 days from the completion of its entitlement package, which would have substantially increased the value of the Project. On November 19, 2008, the Debtor was placed in bankruptcy. The Trustee, as chapter 11 trustee, decided not to continue with entitlement or other development of the Oak Knoll Project. In 2012, under the relevant Plan and Confirmation Orders, the Oak Knoll Project was conveyed to Lehman on an "as is" basis for $48 million. [UF Nos. 200, 201]

The operative Second Amended Complaint in this proceeding (the "SAC") asserts that the Debtor paid SCM more than $5.1 million in Management Fees (which requires a project value of at least $168 million, as Operating Management Fees are 3% of gross sales revenue). When the Oak Knoll Project was transferred to Lehman in 2012, SCM valued the Project at $25.4 million. Three percent of $25.4 million is $762,000; accordingly the SAC claims that SCM was overpaid by approximately $4.3 million. [*Note from the Court: The Opposition changes this calculation. It uses the $48 million valuation that was the basis for the "sales" price to Lehman: 3% of $48 million is $1.4 million. The Opposition asserts that SCM was paid $4.1 million in Management Fees, which would be $2.7 million more than it was entitled to.*]

The SAC also asserts that SCM charged, and was paid for, expenses that it was

not entitled to under the DMA. The first and second claims of the SAC assert that

SCM's failure to return these overpayments of management fees and expenses is a

breach of contract and constitutes unjust enrichment giving rise to a claim for restitution.

(The SAC also asserts claims for fraudulent transfer and preferences that are not the

subject of this MSJ.)

**Motion for Summary Judgment** - This MSJ seeks summary judgment on the Trustee's

breach of contract and unjust enrichment claims, arguing as follows:

The Trustee is analogous to the owner of vacant property who hires a contractor

to build a house and landscape the grounds, promising to pay a fee that is a percentage

of the sales price of the finished house and grounds.  Over many months the contractor

manages the project: acquiring numerous permits, hiring subcontractors, preparing

architectural plans, preparing foundations for the house, *etc*. However, before the walls

are erected, the owner stops funding the project and allows the property to be

foreclosed upon.  The owner then demands that the contractor repay him the amounts

the owner had paid for the work that had already been performed, pursuant to a new fee

calculated by the owner as a percentage of the foreclosed-upon value.  That is this

lawsuit and it is a mockery.  SCM is entitled to summary judgment on the Trustee's

breach of contract and restitution claims that are premised on the surrender of the

Project to Lehman.

Breach of Contract

The Trustee cannot identify a contract in which SCM agreed to a reconciliation

(or "true-up"), whereby SCM would return monies to the Debtor in the event that the

parties overestimated the gross sales revenues from the Oak Knoll Project in calculating

the monthly management payment to SCM. The DMA does not contain any true-up or

reconciliation provision. The Debtor's operating agreement contains no true-up

provision and does not require SCM to pay anything to the Debtor.

The Grandparent Operating Agreement does contain such a reconciliation

provision, but it governs operations between the owners of the Debtor's Grandparent.

Neither the Debtor nor SCM are parties to the Grandparent Operating Agreement, the

Debtor is not entitled to anything under this agreement, and SCM is not obligated to

anything under this agreement.  The true-up in the Grandparent Operating Agreement

provides for the redistribution of funds between the Lehman Fund and the SunCal

Entity, the upstream equity of the Debtor.  The Debtor is not a beneficiary of the

Grandparent Operating Agreement, which explicitly rejects any third-party rights.  In

fact, the existence of this true-up provision in the Grandparent Operating Agreement

undercuts the Trustee's argument, because it suggests that if the parties had intended a

true-up between the Debtor and SCM, they would have put it in the DMA.

Even if there had been a true-up provision, it would not have been triggered by

the turnover of an uncompleted project to Lehman at a price set by Lehman.  The very

premise of the parties' contractual relationship was the development of a fully-built-out

Project. The DMA, and the heavily negotiated project budgets pursuant to the DMA,

were premised on a fully-built-out Project.  The Grandparent Operating Agreement was

also premised on - and its true-up provision is measured upon - the completion of the

Oak Knoll Project.

In fact, a true-up based on the Project's "as-is" value would be unfair to SCM,

because such a reconciliation would not reflect the value of the work done by SCM.

Much of the work to bring the Project to completion had already been done, but that work would not be reflected in the value of the Project until (in part) entitlements were approved and (in part) the Project was completed. The projected gross revenues for the Project in the approved budget in 2007 were $560 million (which supports a management fee of over $22 million). The purported "as is" value of the Project upon transfer to Lehman was only $48 million. By transferring the Oak Knoll Project back to Lehman as-is, the Debtor effectively cut the value of the Project and stole the vast majority of compensation it had promised to pay SCM.

Even if there had been such a "true-up" provision in the DMA, the Trustee would not be entitled to bring an action to enforce it.  Under California law, performance by the Debtor is a necessary element of the Trustee's breach of contract claim, and the Debtor breached the DMA in several ways.

The Debtor rejected the DMA, pursuant to the relevant Plan and Confirmation Order.  (All executory contracts not listed on Exhibit A-1 of the Plan Supplement were rejected [SCM's RJN[3] Ex. 102 at 90-91; Ex. 103 at 56] and the DMA was not listed on Exhibit A-1 [Dkt. 3162].)  This rejection constitutes a breach that gave SCM a claim against the Debtor and excused nonperformance by SCM.

The Debtor did not fully perform its duties under the DMA, also excusing SCM's nonperformance.  The Debtor's principal obligation under the DMA was funding the Project through completion, but it stopped paying SCM and funding other expenses of the Project prior to completion.  This failure was a material breach of the DMA and it deprived SCM of the cash necessary to continue to develop the Project, thus preventing SCM from performing under the DMA and from receiving the benefits of its

---

[3] RJN refers to the Defendants' Request for Judicial Note [dkt. 311-1].

performance.  Furthermore, the Debtor's breach necessarily occurred prior to SCM's alleged breach of failing to return the excess fees.

The Debtor's failure to fund also breached the covenant of good faith and fair dealing in the DMA and constitutes of failure of consideration, which also excused SCM's performance.

Restitution and Unjust Enrichment

There are at least three reasons why the Trustee cannot recover on his restitution/unjust enrichment claim.

One, the law provides no cause of action for unjust enrichment or restitution. Unjust enrichment is not a cause of action, just a restitution claim.

Two, a plaintiff may not recover for unjust enrichment if an actual contract governs the parties' relationship. Here the existence of the DMA precludes an unjust enrichment claim.

Three, unjust enrichment requires receipt of a benefit and the unjust retention of that benefit at the expense of another.  There is no unjust enrichment where the plaintiff gets the exchange that he expected.  The voluntary payment doctrine bars recovery of money that was voluntarily paid with knowledge of the facts.  Here the Debtor got exactly what it expected – management services in exchange for compensation. SCM's compensation was not at SCM's discretion (as the Trustee alleges), rather it was negotiated among the Debtor, SCM, and Lehman.  SCM was paid for (some of) the work it performed.  Any loss by the Debtor was the result of the Debtor's own actions in transferring the Project back to Lehman "as-is" before completion, actions that also harmed SCM.

Alternative Motion for Summary Adjudication

In the alternative, Defendants move the Court for summary adjudication of the following issues (and any other issues the Court may deem appropriate):

1.   Under the contract on which Plaintiff sues (the DMA), the Debtor had an obligation to pay SCM to complete the Project;

2.   Under the contract on which Plaintiff sues (the DMA), the Project would not be completed before the sale of all buildable residential lots;

3.   The Debtor stopped paying SCM before the Project was completed;

4.   SCM was not a party to a "true-up" or "reconciliation" with the Debtor, under the DMA or any other alleged contract between them, under which SCM would have been obligated to return to the Debtor management fees the Debtor paid to SCM;

5.  If a "true-up" or "reconciliation" existed between the Debtor and SCM, as alleged by Plaintiff, such "true-up" or "reconciliation" would not have been triggered until the Project was completed; and

6.   SCM did not unjustly retain any benefits received from the Debtor.


**Opposition** – The Trustee argues as follows:


Breach of Contract Claim

The DMA is the sole agreement governing the relationship between the Debtor and SCM.  SCM's argument that the DMA was "just a starting point" for agreements governing the Project and the payment of management fees is patently false. Mr. Cook asserts that the DMA was prepared and signed based on Mr. Cook's understanding of

the Grandparent Operating Agreement, but this agreement was made over seven

months *after* the DMA was signed. Likewise, at the time the DMA was executed no

Lehman entity had an equity interest in the Debtor and the loan documents between the

Debtor and Lehman had not been signed.

The DMA was not rejected under the Plan because it was not executory. *In re Texscan Corp.,* 976 F.2d 1269, 1272 (9th Cir. 1992), held an insurance contract non-executory because the insurer would not have been excused from performing due to the debtor's default.  Here, the DMA does not excuse SCM from performing: if the Debtor - due to lack of funds - fails to pay fees, the fees are merely deferred (as discussed more fully below). Furthermore, even if the Debtor had an obligation to pay SCM, it had substantially performed that (its sole) obligation under the DMA by the payment of $2 million more in management fees than SCM was entitled to.

SCM prepared the revenue projections upon which its management fees were based and paid itself $158,325/month of the Debtor's funds, even after Lehman took over the Project in mid-2007.  SCM has not established that Lehman approved these payments.

The Debtor did not breach the DMA.  The Debtor could not have ordered the cessation of development activities or funding or failed to develop the Project, because it had no employees to do so.  It depended on the employees of SCM and/or Lehman to act on its behalf.  The Trustee's "admissions" about the Debtor's obligations under the DMA – as quoted by SCM in the MSJ – lack foundation as the Trustee was not a party to the DMA and lacks personal knowledge of the circumstances.  Lehman's purported misdeeds – in cutting off funding to the Project – are not attributable to the Debtor.  The Debtor had no employees and no ability to act independently. According to the Debtor's

Second Amended Disclosure Statement, Lehman was only a 50% owner of the Debtor's

Grandparent at the petition date.  The Grandparent Operating Agreement required that

major decisions be made by the Lehman Fund and the SunCal Entity. The DMA

specifically allows for the deferral of Management Fee payments to SCM if funding to

the Debtor is delayed – the Debtor is only required to use its best efforts to obtain funds,

which the Debtor did.

> [SCM] acknowledges and agrees that actual payment of the Management Fee
> may be deferred or delayed because funds are not available from the Project
> Loans or other sources to pay the Management Fee on a current basis. [The
> Debtor] agrees to use its best efforts to obtain funds from the Project Loans and
> other sources in order to pay the Management Fee in accordance with the
> payment schedule set forth above; however, to the extent that funds are not
> available from the Project Loans or other sources to pay the Management Fee in
> accordance with the foregoing schedule, any such shortfall in the payment of the
> Management Fee shall be deferred until such time as funds are available from
> the Project Loans or other sources to make payments of the Management Fee in
> accordance with the foregoing provisions.

[DMA §5.1] In any event, the DMA only identifies defaults by SCM; it contains no

language concerning defaults by the Debtor.

Furthermore, the Debtor's performance was excused in mid-2007 when SCM

reneged on its contractual duties and allowed Lehman to take control of the Project

(while SCM continued to pay itself management fees). This failure by SCM to perform

its contractual obligations prevented the Debtor's performance under the DMA, violated

the covenant of good faith and fair dealing, and resulted in a failure of consideration.

The Project was sold to Lehman at a valuation of $48 million.  Under §5.1 of the

DMA, SCM was entitled to management fees of 3% of this number -- $1.4 million.

However, it caused itself to be paid at least $4.1 million, $2.7 million more than it was

entitled to.

SCM is not entitled to management fees based on a fully-built-out Project. The

DMA's calculation of the management fee is clear and parole evidence cannot be admitted to create ambiguity or contradict clear meaning.  SCM plays fast and loose with the meaning of "Project" and "Property" but these are defined terms in the DMA. SCM's Management Fee was to be 3% of the gross revenues from the sale of the *Property*.  *Property* is defined only as "that certain real property located in the City of Oakland," while *Project* is defined as "the Property, along with all engineering, site development, improvements, and on-site and off-site infrastructure."  Thus, the very formula for calculating the Management Fee makes clear that the fee could be based on the sale of the uncompleted Oak Knoll Property.

The Defendants contend that the Court and the Trustee's counsel have acknowledged that payments to SCM were to be based on a fully-built-out Project, but the statements cited by the Defendants were taken out of context from a writ of attachment hearing.  Furthermore, SCM made these same arguments in its motion to dismiss the Trustee's breach of contract claim, which the Court denied.

SCM's management fees had to be subject to a "true-up."  The DMA provides for a management fee based on actual gross revenues, which can only be determined after the Project has been completely sold.  But it provides for interim monthly payments based on estimated gross revenues.  Without a "true-up" after the Project was fully sold, SCM would necessarily end up either under- or over-compensated.  Contracts should not be interpreted to lead to such absurd results.

Nor does the DMA state an understanding that Management Fees would be based on the sale of completely built-out lots.  It merely says 3% of "the gross revenue derived from the sale of the Property" as well as the funding of any community facilities districts.

The $48 million purchase price to Lehman was not arbitrarily set by Lehman. SCM entered into a settlement agreement with Lehman, the price was based on a valuation and had been disclosed for over two years, and the price was $16 million more than SCM's $32 million valuation.

Restitution/Unjust Enrichment Claim

Contrary to the Defendants' assertions, California law recognizes that unjust enrichment/restitution is a viable cause of action.

Unjust enrichment/restitution is available even where there is a contractual relationship between the parties.

SCM will be unjustly enriched if it is permitted to retain excess management fees. SCM argues it would not be unjustly enriched because the Debtor received the exchange it expected. However, the Court has already determined that the paying of excessive management fees would constitute unjust enrichment [April 4, 2014 Oral Ruling [RJN Ex. 7] at 22-23]. Further, the Debtor did not receive the exchange it expected under the DMA.

The Defendants have not met their heavy burden of establishing that there is no issue of triable fact regarding the affirmative defense of the voluntary payment doctrine. The Debtor did not have any employees to make these payments and (as set forth above) Lehman's acquiescence cannot be attributed to the Debtor.  Even if it could, SCM has not established that Lehman authorized each payment.  Furthermore, excessive payments made in ignorance of the fact they are excessive are recoverable. The Debtor had no employees and no way of knowing that the estimated management fees paid to SCM would turn out to be excessive. Even if SCM's employees could be

considered agents of the Debtor, there was no way of knowing that the fees were

excessive until the Project was conveyed to Lehman in 2012.

**Reply** – the Defendants argue as follows:

The Trustee is contorting the facts in an effort to avoid the plain evidence and the

Trustee's heavy burden - as plaintiff - to prove facts sufficient to support a jury finding in

his favor on each element of his claims.

The Trustee misstates the Defendants' position – asserting that the Defendants

argue that the transfer of the Project to Lehman did not trigger a "true-up" because

Lehman arbitrarily set the sales price. In fact, the Defendants argue multiple reasons.

Most fundamentally, the Project was not completed and the lots were not sold, because

the Debtor did not fund it to completion. Thus, the DMA was not performed.  The

Trustee's theory of the case would allow a project owner to cut off funding for a project it

owns and transfer the project - contrary to its business plan - and then seek

recompense from the development manager because the project's uncompleted status

resulted in a depressed sales price.  The Trustee faced a choice when he took over the

Project: (i) proceed under the DMA and fund the Project to Completion or (ii) stop

funding, essentially allowing Lehman to foreclose on the Project.  The Trustee chose

(ii), but wants the benefits of (i).

Contract Interpretation Principles

In interpreting the parties' relationship, the Court should be guided by the

following principles:

- The fundamental goal is to give effect to the intent of the parties.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- The Court should evaluate all related agreements regarding substantially the same transaction together, whether or not executed simultaneously or between the same parties.

- Words should be interpreted in the context of the contract as a whole with reference to the circumstances and the matter to which it relates.

- Course of performance is the best and most reliable evidence of the parties' intent.

<u>The Parties Agreed to Compensation Based a Completed Project</u>

The DMA is premised on an agreement that the Debtor would develop the Project into a master-planned community and would pay SCM as its development manager. The DMA's intent and SCM's compensation is based on the sale of **lots**. [DMA Recital A; §5.1]  These lots required substantial development work and they did not exist when the Project was "sold" to Lehman.  The DMA is clear that it was to "continue in full force and effect until the completion of all obligations of [the Debtor] relating to development of the Project and the sale of all of the Property."  [DMA §6.1] The parties' intent that the Debtor be obligated to fully develop the Project is also explicitly stated in the Loan Agreement. [Cook Dec. Ex. 6] This intent is also evidenced by the Project Budgets (which were heavily-negotiated and approved by the Debtor and Lehman) and the Grandparent Operating Agreement, both of which are premised on the ultimate sale of the completed Project.

All testimony in this case also confirms the basis of the parties' bargain – that the Debtor would develop its Project into a master-planned community and would pay SCM to do so.  [The Reply then quotes from the declarations of Frank Cappello (former VP at

Lehman), Danielle Harrison (asset manager at SCM and former employee of Lehman's

agent Trimont), Bruce Cook (general counsel of both SCM and the upstream minority

owner of the Debtor and the preparer of the DMA), Bruce Elieff (manager and owner of

SCM and indirect owner of minority interest in the Debtor), and Patrick Keliher (general

manager of the Oak Knoll Project).]   In the litigation of earlier motions to dismiss, the

Trustee has even admitted that the purpose of the DMA was to develop the Project into

lots.

The Trustee has presented no evidence showing any agreement that SCM would

be compensated on any basis short of the completed Project.  Applying the "true-up"

based on the transfer of the uncompleted Project (as the Trustee requests) would

permit the Trustee to rewrite the contract and deprive SCM of the majority of its

contemplated compensation.  This result would be unjust, impermissible (as bankruptcy

courts may allow debtors to escape burdensome contracts, but do not have the power

to rewrite contracts), and contrary to the law's requirement that interpretation be fair and

reasonable.


The Debtor and SCM Did Not Agree to a "True-up"

The DMA does not provide for a "true-up" if fees and expenses are under- or

over-paid.  The Trustee fails to identify any other contract that provided for such a "true-

up" between the Debtor and SCM.


Debtor's Breach of the DMA Precludes Trustee's Breach of Contract Claim

California law requires that a party seeking to enforce a contract must have

performed its own obligations under that contract.  Here, the Debtor and/or the Trustee

failed to fund the Project, failed to pay SCM its Management Fee and expenses, failed

to assume the DMA, failed to complete the Project, transferred the Project back to

Lehman in an uncompleted state, and failed to compensate SCM based on such

completion.  The Debtor and/or Trustee have breached their contractual duties, as well

as the covenants of good faith and fair dealing.

The Debtor's lack of employees neither deprives it of its ability to act as a limited

liability corporation nor excuses it from the responsibility to act. Practically speaking, the

Debtor has the ability to act through its members and managers/officers. No law

absolves an entity of contractual obligations due to lack of employees.

The Trustee seeks to distance the Debtor from majority-owner Lehman, but

Lehman' actions did not absolve the Debtor from its obligations under the DMA to pay

for the Project.

The Trustee points to the provision of the DMA allowing the Debtor to defer the

payment of the Management Fee.  This provision offers the Debtor only a short respite;

it does not permanently excuse the Debtor from paying the Management Fee and

developing the Project.  Such an interpretation is absurd and inconsistent with the only

evidence on the intent of the parties in this matter, as set forth in the declarations of

Bruce Cook and Bruce Elieff.  In any event, this "delay in fee payment" provision does

not excuse the delay in payment of expenses or payments arising from the sale of lots.

The Trustee contends that the Debtor's "overpayment" of SCM excused the

Debtor from paying SCM to complete the Project starting in 2008, but the overpayment

did not become evident until the purported sale of the Project in 2012.  If the

"overpayments" were evident when the payments were made - in 2007 - this action

would have been time-barred by the time it was commenced in 2012.  And in fact, in

opposing SCM's motion to dismiss based on the statute of limitations grounds, the Trustee had argued that SCM did not breach until (and the Debtor's breach of contract action only accrued upon) the 2012 sale of the Project to Lehman.

The Trustee's argument that the Debtor's failure to pay SCM was excused as of mid-2007 - when Lehman started to exercise significant control - is also baseless. The Trustee does not identify a single thing that SCM should have done that it did not do or any actual breach of its duties by SCM. There is testimony that there was not much left for SCM to "decide" (not to "do" as the Trustee misquotes). But decision-making by Lehman (the majority owner) is not inconsistent with SCM's performance as development manager and the detailed evidentiary testimony shows that SCM performed a voluminous amount of work during that time.

The Trustee disavows his own deposition testimony, arguing lack of foundation, but the Trustee has also acknowledged in a verified declaration (an admission in which he affirmatively asserts that he does have foundation) that the Debtor was obligated to fund the Project and the only reason the Project was not developed during the Debtor's bankruptcy was the Debtor's lack of funds. [RJN, Ex. 107, p. 410-412]


Debtor Rejected the DMA

The Trustee asserts that the DMA was not executory and hence not rejected, but the facts contradict this assertion. Pursuant to the Plan and Confirmation Order, the Debtor included the DMA in its list of executory contracts and failed to include it in the list of assumed contracts. And, in fact, material performance was due on both sides. SCM had not yet completed the Debtor's Project and the Debtor had not yet finished paying SCM.

Unjust Enrichment Claim

The Trustee cannot be granted relief for unjust enrichment because the Debtor and SCM had an express contractual relationship that governs this dispute, and California law bars unjust enrichment relief that arises from a contractual relationship. The Trustee cites *Buss v. Superior Court*, 16 Cal. 4th 35, 39 (Cal. 1997), as allowing such relief, but the court in *Buss* allowed the unjust enrichment claim only because it fell outside the scope of the insurance contract between the parties. Here, the Trustee alleges overpayments purportedly based on the terms of the contract.

Further, the Trustee has not shown that SCM's retention of the amounts paid to it is unjust. The Trustee must show that the Management Fee paid by the Debtor exceeded the value of the services SCM provided. The Defendants have presented evidence of an enormous quantity of work performed by SCM for the Debtor.  [Motion at 13-14 and Reply at 32-33 have a long list of work performed by SCM on the Project.] The Trustee failed to meet his burden to rebut this evidence and prove that the Debtor's fee payments exceeded the value of SCM's services.

As value is not added linearly, the Debtor and Trustee's decision to cease work shortly before project entitlement meant that much of the work performed by SCM was not reflected in the "as is" value of the Project.  Further, the Project had projected gross revenues of $560 million (as of 2007) and $522 million (as of 2008), which would have entitled SCM to management fees of $22 million or $21 million, respectively.  The Debtor actually paid SCM a little more than $4 million.  By ceasing development and transferring the uncompleted project back to Lehman, the Debtor effectively cut the value of the Project and SCM's benefit of the bargain.  The Trustee's unjust enrichment

claim would work a manifest injustice on SCM, requiring SCM to have performed years

of work virtually for free.

**Analysis**

Summary Judgment Standard

Summary judgment is proper when the pleadings, discovery, and affidavits show

that there is "no genuine dispute as to any material fact and that the movant is entitled

to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those which

may affect the outcome of the proceedings. *Anderson v. Liberty Lobby, Inc.,* 477 U.S.

242, 248 (1986). A factual dispute is genuine where the evidence is such that a

reasonable jury could return a verdict for the non-moving party. *Id.* The party moving for

summary judgment bears the burden of identifying those portions of the pleadings,

discovery, and affidavits that demonstrate the absence of a genuine issue of a material

fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The facts must be viewed in

the light most favorable to the party opposing the motion. *Anderson*, 477 U.S. at 249;

*Masson v. New Yorker Magazine,* 501 U.S. 496, 520 (1991).

Breach of Contract Claim

The DMA is premised on the development and sale of the Property in "buildable

residential lots for sale to merchant builders and, if applicable, commercial lots for sale

to other developers."  [DMA, Recital A] The DMA plainly contemplates that the Debtor

has obligations to bring about that completion and sale: "This Agreement shall . . .

continue in full force and effect until the completion of all obligations of [the Debtor]

relating to the development of the Project and the sale of all of the Property." [DMA

§6.1]  The DMA provides for termination by the Debtor, either with or without cause, but does not provide for termination by SCM. [DMA §6.2, §6.3] The DMA provides for "Defaults" by SCM, but not the Debtor. [DMA §7]  The DMA does not expressly address the situation at issue in this proceeding: where the Project is not completed due to a lack of funding.  The DMA does not contain any express provision for a "true-up" (reconciliation) in any circumstances.

It should be noted that the Grandparent Operating Agreement does provide for such a "true-up." Section 3.10(c) of the Grandparent Operating Agreement provides for the payment of a "Development Fee" by the Grandparent to its managing member (which was the SunCal Entity at the August 8, 2006 date of the Grandparent Operating Agreement).  Like the Management Fee in the DMA, this Development Fee is 4% of gross revenues, with 2% payable on a current monthly basis.  Unlike the DMA, the Grandparent Operating Agreement provided for a "true-up" if, after the sale of the last lot, the "Actual Development Fee" is greater or less than "the Development Fee heretofore paid to the Manager." [Grandparent Operating Agreement §3.10(c)(iii)]

Thus, while the DMA governs the parties' relationship over the development of the Project, it does not expressly address the issue that has arisen in that development: whether the Debtor is entitled to a "true-up" of Management Fees in the event that the Debtor stopped development of the Project and sold the Project in an uncompleted state. To address this issue, the Court could consider additional evidence to supplement the terms of the DMA.  California law allows evidence of consistent additional terms so long as the contract is not intended as a "complete and exclusive statement" of terms.

(a) Terms set forth in a writing intended by the parties as a final expression of their agreement with respect to the terms included therein may not be contradicted by evidence of a prior agreement or of a contemporaneous oral agreement.

(b) The terms set forth in a writing described in subdivision (a) may be explained or supplemented by evidence of consistent additional terms unless the writing is intended also as a complete and exclusive statement of the terms of the agreement.

(c) The terms set forth in a writing described in subdivision (a) may be explained or supplemented by course of dealing or usage of trade or by course of performance.

(d) The court shall determine whether the writing is intended by the parties as a final expression of their agreement with respect to the terms included therein and whether the writing is intended also as a complete and exclusive statement of the terms of the agreement.

Cal. Civ. Proc. Code §1856.

Several facts support a conclusion that the DMA was not intended as a "complete and exclusive statement" of terms. The DMA governs the development of land worth $100 million in its pre-developed state and is only 15 pages long. (By contrast, the Grandparent Operating Agreement is 135 pages long, 200 pages with exhibits.) The DMA does not provide for termination by SCM or default by the Debtor, and instead contemplates only completion of the Project, termination of the agreement by the Debtor, or a default by SCM. Furthermore, it does not contain an integration clause.

The parties have introduced voluminous evidence and legal authority respecting the DMA's intent in these circumstances. However, the Court need not turn to this evidence and thorny issues of contract interpretation, because the Debtor and/or the Trustee's material breach of the DMA precludes the Trustee from seeking relief for breach of contract.

It is undisputed that the Debtor stopped funding the Project at the time of Lehman's September 2008 bankruptcy filing or shortly thereafter, as a result of Lehman's failure to provide any additional funding to the Project. [Faye Dec. ¶3, ¶4; Elieff Dec. ¶34, ¶35] The express terms of the DMA make it clear that this failure to

fund was a material breach of the DMA. Whether or not the DMA provides for "events of default" by the Debtor, the Debtor is clearly obligated by the DMA to bring the Project to completion and sale. The funding of the Project was the Debtor's major, if not sole, responsibility in that regard. [*See also* Trustee's Opposition to Motion to Dismiss [Dkt. 75 & Ex. 44 to Motion] at 25:17-18 ("The Debtors [sic] only obligation was to pay SunCal"); Trustee's Responses to Argent's Interrogatories [Ex. 45 to Motion] at 7:10-11 ("the Debtor's only obligation under the DMA was to pay SCM management fees as well as limited expenses")]  While the DMA does allow for the deferral of Management Fees to the extent that funds are not available to pay the fees, it cannot be read to permanently absolve the payment of these fees, as such a reading flies in the face of common sense and the essence of the parties' bargain in the DMA.  In any event, the Debtor also failed to fund Project expenses, another major funding obligation under the DMA. The DMA does not provide for the deferral of such expenses. This breach based on the Debtor's failure to continue to fund the Project necessarily occurred prior to the breach by SCM, which ceased the performance of its development duties under the DMA *as a result* of the lack of funding by the Debtor/Trustee. [Keliher Dec. ¶16; Faye Dec. ¶4; Elieff Dec. ¶35]

The Trustee's arguments that SCM breached the DMA prior to the Debtor's failure to fund the Project do not withstand scrutiny.  Any breach based on SCM's failure to repay overpaid Management Fees would only have occurred in 2012.  The overpayment alleged by the Trustee could only become evident upon the sale of the Project – which occurred in 2012.  As the Trustee states in the Opposition: "no one could have discovered that SCM received excess Management Fees until the conveyance of the Project to Lehman in March 2012." [Opposition at 32:6-8]

As for the argument that Lehman's 2007 takeover of decisions on the Project constituted a dereliction of duty by SCM, control (or decision-making) by Lehman (who held a substantial equity interest in the Debtor) is not inherently inconsistent with project management of the Project by SCM: Article 1 of the DMA sets out SCM's responsibilities as development manager and they are explicitly subject to approval and direction by the Debtor. The Defendants have provided uncontroverted evidence of voluminous development work performed by SCM on the Project from March 2006 to November 2008. [Keliher Dec. ¶10, ¶11; Elieff Dec. ¶16 ]  The Trustee has failed to present any evidence (i) that Lehman's decision-making reduced SCM's development work or otherwise had a negative effect on SCM's development of the Project or (ii) to support his assertion that this takeover effectively prevented the Debtor from building out the Project.

Furthermore, in the absence of fraud, misrepresentation, or an act of bad faith, a "Default" by SCM under the DMA requires written notice by the Debtor and an opportunity to cure. [DMA §7.1]  Perhaps tellingly, there is no evidence that the Debtor gave SCM written notice of breach - for either overpayment of management fees or takeover of control by Lehman - prior to the time it ceased funding the Project in late 2008.

The Trustee also argues that, without its own employees, the Debtor could not have stopped funding.  While a lack of employees may be relevant to issues of the Debtor's intent - particularly vis-a-vis SCM and/or Lehman, who exercised some control over the Debtor and/or acted for the Debtor - the Trustee's "no employees" argument cannot be used to excuse the Debtor from its contractual obligations. The Trustee is essentially arguing that the lack of employees excused the Debtor from its legal

responsibilities, but this assertion is, of course, not supported by any legal authority. If

the Debtor was not responsible for its legal obligations, then it could not function as a

separate legal entity.

The Trustee also rejected the DMA on behalf of the Estate. The Confirmation

Order provides that all executory contracts not listed on Exhibit A-1 of the Plan

Supplement as amended "are hereby rejected." [RJN Ex. 103, p. 226]  The DMA is not

listed on the amended Exhibit A-1 to the Plan Supplement. [RJN Ex. 105]  Bankruptcy

law treats this rejection as a breach occurring just prior to the November 2008 petition

date.  11 U.S.C. §365(g)(1).

The Trustee argues that the DMA was not executory, but material performance of

development and payment remained on each side.  The DMA was listed on the Debtor's

Schedule G of executory contracts and that same Schedule G was annexed to the Plan

Supplement as part of Exhibit A-2's list of executory contracts. [RJN Ex. 104, p. 344]

The Trustee compares this case to *In re Texscan Corp.*, 976 F.2d 1269 (9th Cir. 1992),

which held that

> although both Chapter 11 debtor and insurer had reciprocal obligations under
> retrospective insurance premium contract, failure of debtor to pay premiums
> would not relieve insurer of its obligation to perform in light of Arizona statute,
> and thus, contract was not "executory contract" that could be rejected by debtor.

976 F.2d at 1269 (quote from summary of holding).  The Trustee argues that the DMA

provision allowing deferral of the monthly payment of the Management Fee [DMA §5.1]

means that the Debtor's default on the Management Fees would not excuse

performance by SCM. Thus, like the insurance contract in *Texscan*, the DMA is not

executory.  However, as discussed above, this DMA provision allows deferral, but not

waiver, of the management fees and, in any event, it does not cover the payment of

expenses required under the DMA.

The Debtor/Trustee's material breach of the DMA excuses SCM's further

performance and precludes a breach of contract claim by the Trustee against SCM.

> A bedrock principle of California contract law is that "[h]e who seeks to enforce a contract must show that he has complied with the conditions and agreements of the contract on his part to be performed." *Pry Corp. of Am. v. Leach*, 177 Cal.App.2d 632, 2 Cal. Rptr. 425, 429–30 (1960) (citing *Cameron v. Burnham*, 146 Cal. 580, 80 P. 929, 930 (1905)). *See also Loral Corp. v. Moyes*, 174 Cal.App.3d 268, 219 Cal. Rptr. 836, 844 (1985) ("The requirement of performance may be excused by the other party's breach.").

*Brown v. Dillard's, Inc.,* 430 F.3d 1004, 1010 (9th Cir. 2005).  Accordingly, summary

judgment must be granted to the Defendants on this claim.


Unjust Enrichment/Restitution Claim

A claim based on unjust enrichment – whether titled unjust enrichment or

restitution – may be brought under California law.

> Some California courts allow a plaintiff to state a cause of action for unjust enrichment, while others have maintained that California has no such cause of action. *Compare Prakashpalan*, 223 Cal.App.4th at 1132, 167 Cal.Rptr.3d 832 (allowing plaintiffs to state a cause of action for unjust enrichment) with *Durell v. Sharp Healthcare*, 183 Cal.App.4th 1350, 1370, 108 Cal.Rptr.3d 682 (2010) ("There is no cause of action in California for unjust enrichment.") (internal quotation marks and citation omitted). While California case law appears unsettled on the availability of such a cause of action, this Circuit has construed the common law to allow an unjust enrichment cause of action through quasi-contract. *See Astiana v. Hain Celestial Grp., Inc.,* 783 F.3d 753, 762 (9th Cir. 2015) ("When a plaintiff alleges unjust enrichment, a court may 'construe the cause of action as a quasi-contract claim seeking restitution.' ") (quoting *Rutherford Holdings, LLC v. Plaza Del Rey*, 223 Cal.App.4th 221, 231, 166 Cal.Rptr.3d 864 (2014)). We therefore allow the cause of action, as we believe it states a claim for relief as an independent cause of action or as a quasi-contract claim for restitution.

*ESG Capital Partners, LP v. Stratos*, 828 F.3d 1023, 1038 (9th Cir. 2016)

An unjust enrichment claim under California law requires "receipt of a benefit and

unjust retention of the benefit at the expense of another." *Hirsch v. Bank of Am.,* 107

Cal. App. 4th 708, 717 (2003) (quoting *Lectrodryer v. SeoulBank,* 77 Cal. App. 4th 723,

726 (Cal. Ct. App. 2nd Dist. 2000)).  "[R]elief is available under this theory upon a

determination that under the circumstances and as between the two individuals, it is

unjust for the person receiving the benefit to retain it. (Rest., Restitution, § 1, com. c, p.

13 . . . ."  *Id.* at 722. The Trustee asserts that "allowing SCM to retain fees in excess of

the Project's final value would unjustly enrich SCM" [SAC ¶87] and deprives the Debtor

of the exchange it expected [Opposition at 28:5-6].

      While a valid contract governing the rights of parties generally serves to bar an

unjust enrichment claim, *see, e.g., Paracor Fin., Inc. v. Gen. Elec. Capital Corp.,* 96

F.3d 1151, 1167 (9th Cir. 1996),

> California law allows a breaching party to recover under an unjust enrichment
> theory for the benefit conferred upon the non-breaching party minus damages to
> the non-breaching party. *See United States ex rel. Palmer Constr., Inc. v. Cal.
> State Elec., Inc.*, 940 F.2d 1260, 1262 (9th Cir.1991) (citing 12 S. Williston, A
> Treatise on the Law of Contracts §§ 1479-84 (3d ed. 1970) (Williston); 1 B.
> Witkin, Summary of California Law (Contracts) §§ 91-96 (9th ed.1987); 55
> Cal.Jur.3d (Restitution) § 66-67 (1980)).

*Billfish, Inc. v. Campbell*, 187 F.3d 646 (9th Cir. 1999)(unpublished opinion); *see also*

*United States v. Alvarez*, 999 F.2d 544 (9th Cir. 1993)("traditionally analyzed as an

issue of restitution in favor of a party in breach"); *Harriman v. Tetik*, 56 Cal. 2d 805, 811

(Cal. 1961)(to avoid unjust enrichment, even a willfully defaulting party may recover

consideration paid to the extent he could show it exceeded damages to other party).

      It is undisputed that the Debtor conferred a benefit of $4 million of payments for

management fees and $3 million of payments for expenses. Under California law, the

Trustee has a claim for unjust enrichment (or restitution) unless the damages to SCM

exceeded this $7 million benefit conferred on SCM. So, if the Defendants could

establish as a matter of undisputed fact that SCM's damages exceeded the

approximately $7 million paid by the Debtor, the Defendants would be entitled to

summary judgment on this unjust enrichment claim.

The Court does not know whether SCM could establish that its damages exceeded $7 million. The amount of SCM's damages from the Debtor/Trustee's breach of the DMA was not originally at issue in this MSJ, so the parties have neither briefed nor submitted evidence regarding the amount of such damages.[4]  The Court will continue this MSJ for the purpose of allowing the parties to provide evidence of the amount of SCM's damages.

As a general matter of contract law, SCM's damages for the Debtor/Trustee's breach of the DMA would be expectation damages.

> Damages awarded to an injured party for breach of contract "seek to approximate the agreed-upon performance." (*Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 515, 28 Cal.Rptr.2d 475, 869 P.2d 454 (*Applied* ).) The goal is to put the plaintiff "in as good a position as he or she would have occupied" if the defendant had not breached the contract. (24 Williston on Contracts (4th ed.2002) § 64:1, p. 7.) In other words, the plaintiff is entitled to damages that are equivalent to the benefit of the plaintiff's contractual bargain. (Id. at pp. 9–10; 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 813, pp. 732–733 . . . .

*Lewis Jorge Const. Mgmt., Inc. v. Pomona Unified Sch. Dist.,* 34 Cal. 4th 960, 967–68 (Cal. 2004); *see also* Cal. Civ. Code §3300.  For SCM to be put in as good a position as performance, the Court expects that SCM would need to receive (i) its expected net profits under the DMA (the total expected Management Fees less remaining expected, non-reimbursable costs of performance) and (ii) all incurred, reimbursable costs.  The Court would consider different measurements of SCM's damages that are supported by relevant fact and applicable law.

---

[4] While the Defendants have submitted evidence of work done by SCM on the Project, they have not submitted evidence of its cost or any other evidence about the amount of SCM's damages from the Debtor's breach of the DMA.

**Ruling:**

This MSJ is granted in part: judgment is granted to the Defendants on the first claim for breach of contract.

As to the second claim for restitution and/or unjust enrichment, this MSJ will be continued until September 12, 2017 at 10:00 a.m., in order to give the parties an opportunity to present evidence on the issue of whether SCM's damages arising from the Debtor/Trustee's breach of the DMA exceeded the payments by the Debtor to SCM. No later than September 6, 2017, the Defendants shall file either (i) their evidence of the amount of such damages or (ii) a statement that they do not wish to go forward on this issue (in which case the Court will deny summary judgment to the Defendants on this second claim for unjust enrichment and/or restitution).  The Court will set a schedule for the remaining briefing on this issue at the September 12, 2017 hearing.

Finally, at the hearing on this MSJ, the Defendants' counsel clarified that they were not asking for a final ruling, but merely a recommendation of ruling to the District Court.  As the Court is not aware of any ruling on whether these claims are core proceedings and the Court's resulting ability (or inability) to issue final rulings, it will reserve the issue.  As the parties' numerous motions for summary judgment are not being sent piecemeal to the District Court for interlocutory review, there is no need to resolve at this time whether this Court will be issuing final rulings or proposed findings of fact and conclusions of law.

**Evidentiary Objections:**

The Trustee has interposed numerous objections to the declarations filed by the Defendants in support of this MSJ. (In fact, the Trustee's stated reason for disputing

most of the Defendants' 202 uncontroverted facts is a lack of supporting, admissible evidence - based on his evidentiary objections.)

However, the Court's grant of summary judgment to the Defendants is based primarily on the express terms of the DMA, the Grandparent Operating Agreement, Plan, Disclosure Statement and Confirmation Orders, which were all final, if not all necessarily complete and exclusive, expressions of agreement. As the provisions relied upon by the Court were not ambiguous, the Court did not need to consider any testimony explaining the meaning of those express provisions and could not consider any supplemental evidence contradicting the plain meaning of these clear terms.

Thus, the Court will consider only the evidentiary objections to the testimony that support the Court's two non-documentary conclusions:

1. SCM performed copious amounts of work on the Project and
2. SCM stopped performing its development duties under the DMA after the Debtor stopped funding Management Fees and expenses under the DMA.

(The Defendants have raised three evidentiary objections to testimony, but they do not cover testimony regarding either of these two conclusions.)


Trustee's Evidentiary Objections to Declaration of Daniele Harrison

| Obj # | Ruling |
| --- | --- |
| 39 | Overruled |
| 41 | Overruled |
| 42 | Overruled |


Trustee's Evidentiary Objections to Declaration of Bruce Cook

| Obj # | Ruling |
| --- | --- |
| 53 | Sustained – foundation |
| 56 | Sustained – foundation |
| 57 | Sustained – foundation |

| | |
|---|---|
| 59 | Sustained – foundation |

Trustee's Evidentiary Objections to Declaration of Frank Faye

| Obj # | Ruling |
|---|---|
| 1 | Overruled |
| 3 | Overruled |
| 4 | Overruled |

Trustee's Evidentiary Objections to Declaration of Patrick Keliher

| Obj # | Ruling |
|---|---|
| 3 | Overruled |
| 11 | Overruled |

Trustee's Evidentiary Objections to Declaration of Bruce Elieff

| Obj # | Ruling |
|---|---|
| 7 | Overruled |
| 20 | Overruled |
| 21 | Overruled |
| 57 | Overruled (except as to date of Lehman bankruptcy) |
| 58 | Overruled |
| 59 | Overruled |

Trustee's Evidentiary Objections to Declaration of Aalok Sharma

| Obj # | Ruling |
|---|---|
| 6 | |

Date: August 2, 2017

_____
Geraldine Mund
United States Bankruptcy Judge